IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAJANE HERSH | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MANUFACTURERS AND TRADERS | : | |
| TRUST COMPANY d/b/a M&T BANK, et | : | |
| al. | : | NO. 14-6709 |

**MEMORANDUM**

**Padova, J.**                                                                    **May 31, 2016**

Plaintiff Sarajane Hersh filed this employment action against her former employer, Defendant Manufacturers and Traders Trust Company ("M&T") and two supervisors at M&T, Defendants Miguel Baptista and Ira Brown, asserting claims of gender and disability discrimination, as well as a claim pursuant to the Equal Pay Act, 29 U.S.C. § 206 *et seq*.   Both Plaintiff and Defendants have filed Motions for Partial Summary Judgment.   Defendants seek judgment in their favor on Plaintiff's gender and disability discrimination claims, and Plaintiff seeks judgment in her favor on the Equal Pay Act claim.   We deny both Motions, as there are genuine issues of material fact that preclude the entry of summary judgment in any party's favor at this time.

## I.    BACKGROUND

Plaintiff Sarajane Hersh was hired by Wilmington Trust Company ("Wilmington Trust") as a Vice President and Commercial Real Estate Relationship Manager in July 2001, after having worked for approximately five years as a relationship manager at two different banks.   (Concise Statement of Stipulated Material Facts ("Stip. Facts"), attached as Ex. A to Defs.' Mot. for Partial

Summ. J., ¶ 1; App. 444-45.[1])   Plaintiff was happy with her initial compensation package, which included a starting salary of $75,000, and a $3,000 signing bonus.   (App. 311-12, 442.) Typically, a new Relationship Manager ("RM") at Wilmington Trust was assigned a portfolio of both existing clients and prospects, i.e., businesses with whom the bank had some relationship but which had not yet been secured as clients.   (Stip. Facts ¶ 6.)   When Plaintiff was hired at Wilmington Trust, she was assigned a portfolio of clients, most of whom were transferred from the portfolio of another RM who was retiring.   (App. 313-14.)   Her responsibilities as an RM included managing her portfolio of current clients, developing prospects into clients, and independently identifying new prospects.   (Stip. Facts ¶ 7.)

In 2003 or 2004, Plaintiff began reporting to Defendant Miguel Baptista, a group manager. (Stip. Facts ¶¶ 3, 18.)   Two men, Chris Eckardt and Robert Howard, held similar positions to Plaintiff.   (See Exhibit B to Defs.' Mem of Law in Opp. to Pl.'s Mot. for Partial Summ. J. ("Defs.' Ex. B"), Part 1, at D001903, D001912.)   Eckardt was hired approximately eight months before Plaintiff, in October 2000.   (App. 494.)   Like Plaintiff, Eckardt received a starting salary of $75,000, but he received a larger signing bonus of $7,500.   (Id.)   Howard was hired three years after Plaintiff, in August 2004.   (App. 589.)   He received a starting salary of $93,500, which was approximately $15,000 more than Plaintiff's salary at the time, and he also received a $15,000 signing bonus.   (App. 455, 589.)   Around the same time that Howard was hired, Eckardt received a 14.59% raise, which increased his salary to $95,000, similar to Howard's.   (Defs.' Ex. B, Part 1, at D001912.)   Plaintiff, however, did not receive a similar raise.   (See App. 455.)

In January of 2010, it came to Plaintiff's attention that, although she had believed her job

---

[1] All cites to "App." are to the "Appendix to Plaintiff's Statement of Additional Material Facts and Plaintiff's Comments to Defendants' Statement of Material Facts" (Docket No. 30), which is the most comprehensive appendix filed in connection with either of the pending motions.

title to be Commercial Relationship Manager III ("CRM 3"), her title was actually Commercial Relationship Manager 1 ("CRM 1").   (App. 343-44.)   She asked Baptista about this, and he confirmed that she was a CRM 1, Grade 18.   (App. 513.)   At the time, Howard had a higher title and grade.[2]   (See App. 101-02.)   At Plaintiff's request, Baptista recommended that Plaintiff's title be corrected and she be promoted to a CRM 3, Grade 20.   (App. 97-99, 345, 513.)   In conjunction with that correction and promotion, Plaintiff received an 11.11% merit increase effective in March of 2010 and a second 4.17% merit increase effective in November of that year, the combination of which brought her salary to $100,000.   (App. 90, 97-99, 346, 453.)   Eckardt received a similar raise in October of 2010, so that Plaintiff's salary that year remained much lower than his adjusted salary of $120,001.   (App. 510; Defs.' Ex. B, Part 1 at D000552).   In addition, Plaintiff's salary remained lower than Howard's, which was then $117,000.   (Defs.' Ex. B, Part 1 at D001902-04).

In May 2011, M&T Bank Corporation, M&T's holding company, acquired Wilmington Trust through a merger agreement, and Plaintiff became an employee of M&T.   (Stip. Facts ¶ 5.) Following the merger, Plaintiff continued reporting to Baptista, who was one of two Group Managers for the Commercial Real Estate Department of M&T's Philadelphia region.   (Id. ¶¶ 8-9.)   Baptista reported to Defendant Ira Brown, the Regional President of the Philadelphia region.   (Id. ¶ 10.)

In connection with the M&T-Wilmington Trust merger, cost reductions were planned, and those cost reductions included certain reductions in staff.   (See App. 147-49.)   Brown was responsible for the staff reductions in the Philadelphia region and had certain reduction targets that he sought to meet.   (App. 149-50.)   In identifying staff reductions, Brown worked with his group

---

[2] It appears from the record that Eckardt had temporarily moved to another position within the company.   (See Defs.' Ex. B, Part 1, at D000632.)

managers, including Baptista.   (App. 150.)

Shortly after the Wilmington Trust-M&T merger, in August 2011, Baptista offered Plaintiff the opportunity to move from her position as RM to Portfolio Manager.   (Stip. Facts ¶ 11.)   Brown testified that, at that time, it was apparent that Plaintiff was not good or effective at developing business.   (App. 173, 194.)   Plaintiff advised Baptista and Brown on September 27, 2011 that she did not wish to change her position.   (Stip. Facts ¶ 12.)   After Plaintiff rejected the position, M&T decided not to hire a new portfolio manager.   (App. 190.)

In October 2011, Howard received an $18,000 raise, making his salary $135,000, which far exceeded Plaintiff's salary at the time of $102,500.   (Defs.' Ex. B, Part 1, at D001895; App. 591). M&T paperwork reflects that the reason for this raise was a "Counter Offer," and Baptista testified that it was given to Howard because he had been offered a job elsewhere and the Bank desired to keep him.   (Defs.' Ex. B, Part 1, at D001895; App. 94. )

Plaintiff advised Baptista and Brown on December 19 and 20, 2011, respectively, that she had been diagnosed with multiple myeloma.   (Stip. Facts ¶ 14.)   According to Plaintiff, Brown asked her if she was going to lose her hair.   (App. 337.)   Plaintiff did not request any accommodations and her medical condition did not affect her ability to do her job.   (Stip. Facts ¶ 15.)   She did, however, take time away from work for treatment, and Baptista did not require her to use paid time off for her medical appointments.   (App. 338-39.)

On December 22, 2011, an M&T memo documented a staffing plan for 2012 that called for twelve jobs to be eliminated in the Philadelphia region, Delaware and Georgetown.   (App. 150, 476-78.)   Among the employees slated to be terminated was a Philadelphia RM in Baptista's group, Jack Daryanani, who was identified as underperforming.   (App. 151-52, 477.)   The reduction list also forecast the departure of another RM in Philadelphia, but no particular employee

was selected, because it was anticipated that the reduction would be accomplished through attrition.  (App. 153, 477.)  Plaintiff's name was not on the December 22, 2011 reduction list.  (App. 156).

In January of 2012, Daryanani was notified that his job was being eliminated as part of M&T's ongoing restructuring.  (Stip. Facts ¶ 16.)  Around the same time, Plaintiff advised Baptista that she was now interested in taking the portfolio management position.  (Id. ¶ 17.)  According to Baptista, however, he did not have an "open req for a portfolio manager" at that time.  (App. 125.)  He nevertheless advised Brown that Plaintiff now wanted the position, and Brown said that nothing was available.  (App. 139.)  In addition, Brown believed at the time that Plaintiff "was failing from a performance standpoint" and, therefore, he was not going to let her change positions.  (App. 197.)

In May of 2012, Brown contemplated additional job reductions to meet the goals set forth in the December 2011 memo.  (App. 156-57.)  Brown then began a performance assessment of employees to determine how to meet the bank-mandated reduction goals.  (App. 157.)  He determined that real estate was overstaffed and therefore focused on M&T's two real estate groups, which were managed by Baptista and another manager, Bernie Shields.  (App. 158-59.)  Brown, Baptista, Shields, and Human Resources worked together to identify who to terminate.  (App. 159-60.)

Notably, Brown signed Plaintiff's 2011 performance review that same month, i.e., May of 2012.  (App. 378.)  In that evaluation, Plaintiff was rated "meets expectations" in every category except two in which she received "exceeds expectations" ratings (diversity and teamwork), and she received an overall rating of "meets expectations."  (App. 378-386, 105.)  The manager comments in the business development portion of the assessment state that Plaintiff is not being

penalized for not having generated any new business in 2011 because, due to the merger, the focus during that review period due to the merger was on retaining clients, not new business development, and Plaintiff did well in that regard.   (App. 380.)   Howard and Eckardt were also rated "meets expectations" both overall and specifically for business development in their 2011 performance evaluations.   (App. 105-06.)

In September 2012, before any additional employee was identified for termination, Baptista reassigned responsibility for one of Plaintiff's important clients, Frank McKee, to Howard.   (App. 162, 493.)   Although McKee had not been unhappy with his relationship with Plaintiff, Brown testified that he had concluded, based on his observations, that Plaintiff could not adequately articulate McKee's loan needs to the senior loan committee.   (App. 162.)   Baptista also assigned to Howard a second prospect for whom Howard and Plaintiff had been sharing responsibility, Rouse Chamberlain, even though Plaintiff advised him prior to the reassignment that she and Howard had decided that Plaintiff would take primary responsibility for Chamberlain. (App. 123-24.)

According to Brown, it was very apparent to him in late 2012 that Plaintiff was weak at credit underwriting, i.e., getting behind the numbers and helping to structure deals.   (App. 173.) In addition, Baptista testified that there was significant deterioration in Plaintiff's performance with regard to her existing portfolio in the Summer and Fall of 2012.   (App. 135.)   Baptista elaborated that, in April and June of 2012, Plaintiff sought 90-day extensions to address two multi-million dollar loans that were maturing, when the loans should have been addressed prior to maturity.   (App. 135-136, 138.)

On November 6, 2012, Plaintiff was placed on non-working status.   (Stip. Facts ¶ 18.) Her employment with M&T ended on January 4, 2013.   (Id.)   Brown testified that Plaintiff was

terminated as part of the Wilmington Trust cost initiative.   (App. 200-01.)   Brown did not know if Plaintiff had even been put on a performance plan prior to her termination, but testified that he hoped Baptista would have told her that she was failing prior to her discharge.   (App. 197.) Brown also testified that he would never terminate an employee based on performance without first putting them on a performance improvement plan (App. 200), but, in fact, the evidence is that Plaintiff was never put on a performance improvement plan.   (See App. 594 ¶ 26.)

As of November 5, 2012, immediately before M&T notified Plaintiff of her termination, Plaintiff's position with M&T was Senior RM, Grade 13.   (Stip. Facts ¶ 19.)   Howard and Eckardt had the same titles, grades, and job descriptions.   (Id.; App. 532.)    At the time, Plaintiff had a lower salary ($102,500) than either Howard ($135,000) or Eckardt ($123,000).   (App. 532)

Plaintiff submitted a Complaint to the Pennsylvania Human Relations Commission in May 2013, and cross-filed with the Equal Employment Opportunity Commission in July 2013.   She received a right to sue letter and filed her Complaint in the instant action in November 2014.   The Complaint contains ten counts.   Count I asserts a sex discrimination claim against M&T under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.   Count II asserts a parallel sex discrimination claim under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 et seq.   Count III asserts a disability discrimination claim against M&T under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1210 et seq., and Count IV asserts a parallel claim under the PHRA.   Counts V and VI assert a claim against Baptista for aiding and abetting sex and disability discrimination under the PHRA.   Counts VII and VIII assert aiding and abetting sex and disability discrimination claims against Brown pursuant to the PHRA.   Count IX asserts a claim under the Equal Pay Act against all three Defendants, and Count X asserts a Title VII claim against all Defendants, also based on unequal pay.

Defendants now move for summary judgment in their favor on the claims set forth in Counts I through VIII.   Plaintiff moves for summary judgment in her favor on the claim in Count IX.   No party has moved with respect to Count X.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.   In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).   If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.   Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."   Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the

record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute."   Fed. R. Civ. P. 56(c)(1).   Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Celotex, 477 U.S. at 322.   "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'"   Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

## III.   DISCUSSION

### A.   Defendants' Motion for Partial Summary Judgment

Defendants seek judgment in their favor on Plaintiff's claims of sex and disability discrimination under Title VII, the ADA and the PHRA in Counts I-VIII of the Complaint.

#### 1.   Gender Discrimination

In Counts I, II, V, and VII of the Complaint, Plaintiff contends that Defendants discriminated against her on the basis of her gender in violation of Title VII and the PHRA when they terminated her employment.   Title VII makes it unlawful for an employer to discharge or "otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a).   The PHRA similarly provides that it is "an unlawful discriminatory practice . . . [f]or any employer because of . . . race, color, religious creed, . . . age, [or] sex, . . . to . . . discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment."   43 Pa. Stat. Ann. § 955(a).   We analyze claims brought pursuant to

Title VII and the PHRA pursuant to the same standard.   See Verma v. Univ. of Pa., Civ. A. No.

11–611, 2012 WL 1835727, at *7 (E.D. Pa. May 18, 2012) ("Discrimination claims under the

PHRA are subject to the same standards as Title VII for purposes of summary judgment." (citing

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999))).

      To bring a successful claim under Title VII, a plaintiff must prove that "an employer has

'treated [a] particular person less favorably than others because of' a protected trait . . . [and] 'that

the defendant had a discriminatory intent or motive'. . . ."   Ricci v. DeStefano, 557 U.S. 557, 577

(2009) (first alteration in original) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977,

985–986 (1988)).   In the absence of direct evidence of discriminatory intent, none of which is

available in this case, Title VII discrimination claims are analyzed under the burden-shifting

framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   See Kant v.

Seton Hall Univ., 289 F. App'x. 564, 566 (3d Cir. 2008).

      "Under McDonnell Douglas, the plaintiff bears the initial burden of demonstrating a prima

facie case of unlawful discrimination . . . ."   Dellapenna v. Tredyffrin/Easttown Sch. Dist., 449 F.

App'x 209, 213 (3d Cir. 2011) (citing McDonnell Douglas, 411 U.S. at 802).   In order to establish

a prima facie case of gender discrimination, a plaintiff must ordinarily "show that: (1) she was a

member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse

employment action; and (4) members of the opposite sex were treated more favorably."   Burton v.

Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citing Hugh v. Butler Cnty. Family YMCA, 418

F.3d 265, 267 (3d Cir. 2005)).   A plaintiff may, however, "also meet the last element by showing

that the adverse employment action 'occurred under circumstances that could give rise to an

inference of intentional discrimination.'"   Id. (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d

Cir. 2008)).

Once the plaintiff establishes a prima facie case of discrimination, "'the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision.'"  Dellapena, 449 F. App'x at 213 (quoting McDonnell Douglas, 411 U.S. at 802). "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  Burton, 707 F.3d at 426 (quoting Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006), and citing Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'"  Id. (quoting Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003)).

If the defendant meets its burden, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."  Burton, 707 F.3d at 426 (citing Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994), and Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799-800 (3d Cir. 2003)).   More specifically, the plaintiff "'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Burton, 707 F.3d at 427 (quoting Fuentes, 32 F.3d at 764).   "The plaintiff's evidence . . . 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  Burton, 707 F.3d at 427 (quoting Fuentes, 32 F.3d at 765).

Defendants argue that they are entitled to summary judgment on Counts I, II, V, and VII both because Plaintiff cannot establish a prima facie case of gender discrimination and because she cannot show that its legitimate, nondiscriminatory reasons for her termination are pretextual.

### a.   Prima Facie Case

For purposes of their Motion, Defendants concede that Plaintiff can establish that she is a member of a protected class, was qualified for her position, and suffered an adverse employment action insofar as she was discharged from employment.   They argue, however, that she cannot establish that the circumstances of her job loss give rise to an inference of discrimination.   Thus, in order to decide whether Plaintiff has established a prima facie case of gender discrimination, we must determine whether Plaintiff has pointed to evidence that Defendant treated her differently in connection with her termination than it did other, similarly situated male employees and/or whether the termination occurred under other "circumstances that could give rise to an inference of intentional discrimination."   Burton, 707 F.3d at 426 (quotation omitted).

Plaintiff argues that she can satisfy the fourth prong of her prima facie case because she can establish that her termination "occurred under circumstances that could give rise to an inference of intentional discrimination."   Id. (quotation omitted).   Specifically, she relies on evidence that: (1) she always received ratings of "meets expectations" in her performance reviews, and was never placed on a performance improvement plan; (2) Baptista held sexist attitudes; and (3) she suffered a long history of discrimination in pay and opportunities at both Wilmington Trust and M&T.

As noted above, the evidence is that, in November 2012, there were three senior relationship managers in Baptista's real estate group, two males (Howard and Eckardt) and Plaintiff, all of whom had the same title and salary grade, and yet Plaintiff was paid significantly less than both Howard and Eckardt.   (Stip. Facts ¶¶ 19-20; App. 532.)   Moreover, the evidence

reflects that Plaintiff had been paid less than both Howard and Eckardt throughout their careers at Wilmington Trust and M&T.   (See supra, at 2-4.)

The evidence is also clear that Howard and Eckardt retained their jobs with M&T when Plaintiff was discharged in late 2012.   (Stip. Facts ¶ 18; Defs.' Ex. B, Part 1, at D001884, D001895.)   Plaintiff's termination letter stated that her termination was based on a "business decision to restructure the Philadelphia Commercial Real Estate department."   (App. 523.)   However, Brown has suggested that Plaintiff was terminated following a performance analysis and, thus, also based on her performance.   (See App. 157-59.)   However, throughout Plaintiff's employment with Wilmington Trust and later M&T, Plaintiff consistently received ratings of "meets objectives" or "meets expectations" on her performance evaluations, and there is no evidence that she was ever put on a performance improvement plan.   (App. 385, 393, 403, 410, 415, 426, 439).

With respect to Baptista's allegedly sexist attitude, there is evidence in the record that, on at least two occasions in or around 2005, Baptista entertained clients at strip clubs and that, on one of those occasions, Howard went to the strip club as well.   (App 132-33.)   The record also reflects that Baptista held an annual Thanksgiving luncheon on the Wednesday before Thanksgiving and, at least in 2011 and 2012 (and, indeed, in every year that Baptista could recall), he invited only men, including male clients, both Howard and Eckardt, and the male spouses of certain uninvited female bank employees.   (App. 125-29, 587.)   There is also evidence that Baptista once stated to Plaintiff: "You frustrate me like my wife frustrates me, and I'm still married to her."[3]   (App. 5 ¶ 9(b)).

_____

[3] For this fact and others, Plaintiff cites to her verified Complaint with the Pennsylvania Human Relations Commission.   (App. 3.)   "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material

Based on the evidence, viewed in the light most favorable to Plaintiff, we conclude that a reasonable jury could conclude that Plaintiff's compensation lagged behind her male counterparts, in spite of her satisfactory and comparable job performance, and that Plaintiff's direct supervisor exhibited behavior that evidenced a discriminatory attitude towards women.   We therefore conclude that a reasonable jury could conclude that Plaintiff's termination occurred under circumstances that give rise to an inference of intentional sex discrimination.   Plaintiff has thus satisfied her initial burden of establishing a prima facie case of discrimination that she was terminated on account of her gender.

### b.        Defendants' Reasons for Plaintiff's Termination

Pursuant to McDonnell Douglas, the burden of production shifts to Defendants to articulate a "legitimate, nondiscriminatory reason" for Plaintiff's termination.   Dellapena, 449 F. App'x at 213 (quotation omitted).   Defendants essentially maintain that they terminated Plaintiff because they were required to accomplish layoffs after the merger and that Plaintiff was the lowest performing senior relationship manager.   Brown testified at his deposition that it was determined in 2012 that someone's job had to be eliminated (see App. 147-48, 157), and that the elimination had to come from the commercial real estate department because that group was overstaffed (App. 158-59).   He further testified in that deposition that the bank, as a result, conducted performance evaluations of the employees, looking at "credit maintenance, credit quality, . . . client interaction,

---

issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted)); see also Wright v. City of Philadelphia, Civ. A. No. 13-5589, 2016 WL 1241775, at *1 n.2 (E.D. Pa. March 30, 2016 ("A verified complaint is appropriate evidence at summary judgment to the extent that the allegations in the complaint are based on personal knowledge" (citation omitted)).   We also observe that, to the extent Plaintiff's reliance on the verified complaint is in any way objectionable, Defendants have waived their right to challenge it.   See 10B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (3d ed. 1998) (stating that the failure to move to strike an affidavit that violates Rule 56(e) will result in the waiver of the objection).

. . . new business development, . . . calling efforts and closed business coming out of it," as well as the employee's "ability to clearly articulate their point of view on specific credits to senior management" and achievement of sales goals.   (App. 159-60.)   According to Brown, to make these assessments, they looked at the employees' annual performance assessments.   (App. 160.) At the conclusion of this process, Plaintiff was terminated, and her male counterparts, Howard and Eckardt, retained their jobs.   (See App. 523.)

Defendants argue that M&T had legitimate, non-discriminatory reasons for selecting Plaintiff's position for elimination as part of the cost reduction plan – namely, that she was weak at new business development and managing her client portfolio.   With respect to business development, they point to various comments in Plaintiff's performance evaluations, including (1) a 2005 comment that Plaintiff "had a challenging year," closing just $5 million in loans (Ex. C. to Defs' Mot. for Partial Summ. J. ("Defs' Ex. C"), Part 7, at 28), (2) a 2006 comment that Plaintiff had not met the minimum standard in new business development (id. at 42), (3) a 2007 comment that Plaintiff had not been able to achieve her new business development performance objective and must work hard to improve in that area (id. at 72), (4) 2008 and 2009 comments that Plaintiff needed to improve on building and refining her business development efforts and building a list of prospects (id. at 96, 107), and (5) a 2012 comment that Plaintiff needed to make new business development a priority, as she "has failed to generate new business and convert prospects for a prolonged period of time" (id. at 213).   They also point to Brown's testimony that, in his opinion, Eckardt and Howard were better at bringing in new business.   (App. 201-02.)   They further direct our attention to a Senior Relationship Manager Comparison chart that they prepared, which reflects that, in 2012, Plaintiff achieved only 33% of her new loan goal, and 19% of her target loan fees.   (App. 475.)   In contrast, the chart indicates that Eckardt achieved 143% of his new loan

goal, and 170% of his target loan fees, and Howard achieved 124% of his new loan goal, and 112% of his target loan fees.   (Id.)

With respect to Plaintiff's performance in managing her client portfolio, Defendants observe that Plaintiff testified that one of her clients, Eli Kahn, was taken away from her in January 2012, and she was told that the client had complained to Baptista that she did not sufficiently understand his business operations   (App. 364-65.)   At the same time, there is no evidence that a client ever lodged a similar complaint concerning Howard or Eckardt.   Finally, Defendants rely on Baptista's testimony that in the Spring and Summer of 2012, Plaintiff was not managing her clients' loans well and permitted certain loans to mature without addressing the ramifications of the loan maturing in a timely manner.   (App. 135-36.)

In light of this evidence, we conclude that Defendants have satisfied their burden of production by articulating (and supporting with record evidence) legitimate and nondiscriminatory reasons for their decision to terminate Plaintiff.

**c.          Pretext**

Pursuant to McDonnell-Douglas, the burden shifts back to Plaintiff to point to evidence in the record from which a reasonable jury could conclude by a preponderance of evidence that Defendants' stated reasons for her termination are pretextual.   Burton, 707 F.3d at 426 (citations omitted).   Consequently, to defeat Defendants' Motion for Partial Summary Judgment, Plaintiff "'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"   Id. at 427 (quoting Fuentes, 32 F.3d at 764).   If she proceeds under the first option, and she "come[s] forward with evidence that would cause a reasonable factfinder to find

16

the defendant[s'] proffered reason 'unworthy of credence,' she need not adduce any evidence of discrimination beyond her prima facie case to survive summary judgment."   Id. at 430 (quoting Lichtenstein, 691 F.3d at 310) (additional citations omitted).

Plaintiff maintains that a jury could reasonably conclude, based on the record evidence, that Defendants' proffered reasons for terminating her position -- that a layoff was necessary and she was the lowest performing candidate -- are not credible and, thus, are pretextual.   With respect to Defendants' assertion that her layoff was a necessary component of M&T's cost reduction plan, she points to evidence that a number of individuals previously identified for layoffs in connection with the merger were instead transferred to other positions.   (App. 152-54, 476-78.)   She further notes that there is evidence to support a conclusion that there was an alternative to her own layoff, because the record reflects that M&T posted an RM position in the Philadelphia region in October of 2012, and offered the position to a Wilmington-based RM, Melissa Govette, on November 9, 2012, just three days after Plaintiff was put on non-working status.   (See App. 498, 506.) Govette assumed that position shortly thereafter, on December 3, 2012.   (App. 506, 556-57.) Plaintiff also points to evidence that undermines the credibility of Defendants' assertion that any layoff had to come from Baptista's Commercial Real Estate department because that department was overstaffed – namely, evidence that Baptista's Commercial Real Estate managers were "extremely busy" in 2011, and still in need of assistance in 2012.   (App. 125.)

Plaintiff further asserts that there is a genuine issue of material fact as to whether her credit skills had actually declined between August of 2011 and January of 2012, as Brown has testified (App. 196-97), and maintains that the evidence establishes that she was no different from at least one other relationship manager in Baptista's group (albeit not a senior relationship manager), Carlo DiGiovanni, who was identified in his March 2012 review as failing to see the "big picture."

(App. 459.)   She also references her 2011 performance review which is dated March 2012 and signed on May 2, 2012, and which rated her as having met expectations for credit administration and risk management for the 2011 calendar year.   (App. 378, 380).   Moreover, the manager comments on the portion of the review concerning credit skills included comments that Plaintiff had done a "nice job maintaining her portfolio as it relates to addressing delinquencies and matured loans," that she was "proactive with dealing with deficiencies" and that she did "a good job ensuring that reports were completed and submitted on time."   (App. 380.)   Plaintiff also reiterates that she was never placed on a performance improvement plan (App. 594 at ¶ 26), and points out that the only documentary evidence regarding her alleged trouble meeting credit deadlines prior to January 2012 is one email requesting an update concerning an upcoming deadline and a second commenting that another deal "ha[d] taken too long."   (App. 599-600.)

Plaintiff further asserts that there is evidence from which a jury could conclude that Defendants' assertion that she was weak at business development in comparison to Howard and Eckardt was both incredible and pretextual.   She argues that the evidence demonstrates that Baptista favored Howard and Eckardt when assigning clients and quantifying their business development successes, thereby giving the two men an unfair business development advantage over Plaintiff and ultimately assessing them more favorably using more lenient standards.   She points to evidence that in 2011, Baptista chose to reassign to Eckardt an account that was being handled by another RM who was transferring to Delaware, and then, in his discretion and with Brown's approval, characterized a $18 million loan modification for that client in 2012 as new business on Eckardt's business ledger, reasoning that it was a "major modification" and thus merited unorthodox treatment.   (App. 120-21, 212, 475.)   She also points to evidence that Baptista used his discretion in 2012 to assign to Howard a top client prospect that both she and

Howard were pursuing, and who was potentially worth $10 million, even though Howard and Plaintiff had agreed that <u>Plaintiff</u> would assume full responsibility for the prospect.   (App. 123-24, 246-47, 592.)   In addition, Plaintiff points to evidence that Baptista, in 2012, reassigned to Eckardt a significant client (Frank McKee) who, according to Plaintiff's record testimony, she had brought in as a new client ten years before and who, as even Baptista conceded, really liked Plaintiff.   (App. 353-55, 491.)   Record evidence reflects that, in August of 2011, Baptista arranged for Eckardt to take Plaintiff's place making a presentation about the status of that client's account to the senior loan committee, and then, in mid-2012, advised Eckardt that Eckardt would be taking over the client relationship from Plaintiff, in spite of Baptista's acknowledgement that the client would need some convincing as to the change.   (App. 217-218, 356-57, 491).   Plaintiff further points to evidence of yet another discretionary decision in 2011 or early 2012, in which Baptista chose Howard to handle a $35 million construction loan that the bank was underwriting for a set of clients (237 King Street Partners), which included one of Plaintiff's clients (for whom she had handled the acquisition loan for the same project) as well as one of Howard's clients, and then assigned Howard the full $35 million credit for the loan, when he could have opted to give Plaintiff and Howard shared credit, and Howard testified that he would have accepted such an arrangement.   (App. 118-119, 243-44.)

Upon consideration of this evidence and the remaining record, we conclude that there is a genuine issue of material fact regarding the credibility of Defendants' proffered reasons for Plaintiff's discharge, and that a reasonable fact finder, weighing the evidence, could find Defendants' reasons to be "'unworthy of credence.'"   <u>Burton</u>, 707 F.3d at 430 (quoting <u>Lichtenstein</u>, 691 F.3d at 310).   We therefore deny Defendants' Motion insofar as it seeks judgment in their favor on the sex discrimination claims pursuant to Title VII and the PHRA.

## 2.   Disability Discrimination

In Counts III. IV, and VI and VIII of the Complaint, Plaintiff claims that Defendants discriminated against her on the basis of a disability in violation of the ADA and the PHRA when it terminated her employment.   Title I of the ADA bars discrimination against qualified individuals "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."   42 U.S.C. § 12112(a).   The PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of . . . non-job related handicap or disability. . . to refuse to hire or employ or . . . to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment."   43 Pa. Stat. Ann. § 955(a).   "The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." Bialko v. Quaker Oats Co., 434 F. App'x 139, 141-42 n.5 (3d Cir. 2011) (citing Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002)).

 "In order to make out a prima facie case of disability discrimination under the ADA, [a plaintiff] must establish that she (1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability."   Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006) (quoting Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002); and citing Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998)).   Using the McDonnell Douglas framework, which is applicable to ADA claims as well as Title VII claims, "[i]f the plaintiff makes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reasons for the adverse employment action."   Mercer v. SEPTA,

608 F. App'x 60, 64 (3d Cir. 2015) (citing Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000)). "Once the defendant has provided such a justification, the burden then shifts back to the plaintiff to demonstrate that this stated reason is a mere pretext for discrimination." Id. at 64-65 (citing Shaner, 204 F.3d at 500). Here, Defendants argue that Plaintiff cannot establish the third prong of her prima facie case, i.e., that she lost her job "because of [her] disability," and further argue that she cannot establish that their legitimate, non-discriminatory reasons for her discharge are pretextual. Turner, 440 F.3d at 611 (citation omitted).

In response to Defendants' Motion, Plaintiff points to evidence in the record that Defendants offered to transfer her to the portfolio management position in August 2011, before she became ill, and refused her request to move to that same position in January of 2012, after her December 2011 diagnosis with multiple myeloma. (Stip. Facts ¶¶ 11, 14, 17; App. 125.) In her view, "[t]he timing and circumstances of Defendants' decision not to allow her to take refuge in the Portfolio Manager position [in January of 2012] give ample evidence that her cancer diagnosis was the final contributing factor in Defendants' determination to" terminate her employment. (Pl.'s Mem. in Opp. To Defs.' Mot. for Partial Summ. J. at 12.) Plaintiff avers in her sworn affidavit that, after her cancer diagnosis, Brown and Baptista became more critical of her. (App. 596 ¶ 60.) By way of example, on January 5, 2012, Baptista criticized her for failing to present at a December 28, 1011 meeting, when he knew that she was undergoing radiation treatment at the time. (App. 15 ¶ 34.) In addition, on January 18, 2012, in a one-on-one meeting, Baptista criticized Plaintiff's sales performance, stating that she had not been performing well for six months and warning her that the bank would terminate people who had not met their sales goals in the prior two years and, in the same meeting, he asked her how many Thursdays she would be out for chemotherapy. (App. 15 ¶ 36.) Baptista also criticized Plaintiff in 2012 for failing to be

sufficiently aggressive with one of her clients.   (App. 16 ¶ 38.)   There is also evidence in the record that Brown added another employee to a December 22, 2012 email string between himself and Plaintiff, even though that email referenced Plaintiff's cancer treatments, and Plaintiff had not yet disclosed her illness to others at the bank.   (App. 599.)   Moreover, when Plaintiff confronted Baptist with his error, he simply called the mistake "unfortunate" and apologized.   (Id.)   Finally, Plaintiff relies on evidence that, in late 2012, M&T announced that it was introducing a new health plan for 2013 due to "the significant amount spent by M&T and employees on employee health care [the prior year], over 90% [of which] was associated with the treatment of chronic and catastrophic conditions," which, in Plaintiff's view, demonstrates animosity towards people with illnesses such as hers.   (App. 583-84.)

We conclude that there is sufficient record evidence to establish the third element of Plaintiff's prima facie case.   Indeed, viewing the totality of the evidence in the light most favorable to Plaintiff, including Plaintiff's account of her treatment following her disclosure of her medical condition and her discharge eleven months later, we conclude that a reasonable jury could conclude that her termination in November of 2012 was due, at least in part, to discrimination based on her medical condition.   We therefore conclude that Plaintiff has sufficiently set forth a prima facie case of disability discrimination.

Moreover, for the same reasons we set forth above with respect to Plaintiff's gender discrimination claim, we conclude that Defendants have articulated legitimate, non-discriminatory reasons for her discharge, but that Plaintiff has raised sufficient credibility questions regarding those reasons to give rise to genuine issues of material fact as to whether she was, instead, discharged for discriminatory reasons, including disability in addition to gender.   We therefore deny Defendants' Motion insofar as it seeks judgment in Defendant's favor with respect to

Plaintiff's disability discrimination claims and, thus, deny Defendant's Motion for Partial Summary Judgment in its entirety.

**B.      Plaintiff's Motion for Partial Summary Judgment**

Plaintiff asks in her Motion for Partial Summary Judgment that we enter judgment in her favor on Count IX of her Complaint, which is her claim against all three Defendants under the Equal Pay Act and which seeks compensation for the unequal pay she received from November 21, 2011 through November 5, 2012.

"Unlike . . . Title VII claims, claims based on the Equal Pay Act, 29 U.S.C. § 206 et seq., do not follow the three-step burden-shifting framework of McDonnell Douglas; rather, they follow a two-step burden-shifting paradigm."  Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000). "The plaintiff must first establish a prima facie case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work' – work of substantially equal skill, effort and responsibility, under similar working conditions."  Id. (citing E.E.O.C. v. Delaware Dept. of Health & Soc. Servs., 865 F.2d 1408, 1413-14 (3d Cir. 1989)).   "The burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act."  Id. (citing E.E.O.C., 865 F.2d at 1414).   "The four affirmative defenses enumerated under the Act are: (i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality or production, or (iv) a differential based on any factor other than sex."  Id. at 107 n.6 (citing 29 U.S.C. § 206(d)(1)).   To establish an affirmative defense, an "employer must submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity."  Id. at 107-08 (citation omitted).   Thus, to prevail at trial, "an employer [must] submit evidence from which a

reasonable factfinder could conclude that the proffered reasons actually motivated the wage disparity."   Id.

Plaintiff argues that she has submitted evidence that establishes that, during the time period for which she seeks to recover (November 21, 2011 to November 5, 2012), her two male counterparts, Eckardt and Howard, held her same job title, had the same job description, and reported to the same manager (Baptista), and yet her salary was $102,500, Howard's salary was $135,000, and Eckardt's salary was $123,000.   (App. 532; Stip. Facts ¶ 19.)   She thus maintains that she had met her prima facie case.   She further argues that Defendants have offered no evidence to prove their apparent affirmative defense, which is that the salary differentials are based on factors other than gender.

Defendants do not dispute that Plaintiff can establish her prima facie case.   They argue, however, that we should deny Plaintiff's Motion because, contrary to Plaintiff's contention, the record contains sufficient evidence from which a jury could reasonably conclude that Plaintiff's salary was lower than that of Eckardt and Howard based on factors other than sex.   Generally, they point to testimony that "[n]ot every relationship manager is paid the same," and that an RMs' pay "depends on their background, their experience, how they negotiated when they came in, [and] their performance percentage increases they get every year based on performance."   (App. 292.) With respect to the specific salary difference between Eckardt and Plaintiff, Defendants point to evidence that Eckardt (1) was hired nine months before Plaintiff (see App. 494-95); (2) was hired for a higher-level position and higher salary grade, i.e., Commercial Loan Representative III, Grade 19 (App. 496, 511), than the position and grade at which Plaintiff was hired, i.e., Commercial Loan Representative II, Grade 17 (App. 448), because he, unlike Plaintiff, held a Bachelor of Science in Finance and Economics and a Master's Degree in Business Administration

with a concentration in Finance, and had worked as Vice President of Real Estate Finance for his previous employer (App. 137, 480); (3) spent some time in 2009 in a different department, as a Senior Loan Workout officer (App. 84-85; Defs.' Ex. B, Part 1, at D000632); and (4) had a better performance record than Plaintiff with respect to new business development (App. 201, 203, 475). With regard to Howard, Defendants point to evidence that Howard (1) was hired after Plaintiff, in August of 2004 (App. 589); (2) was hired for a higher-level position and higher salary grade (Commercial Loan Representative III, Grade 19) than Plaintiff because he held a Bachelor of Science Degree in Finance (App. 136, 481; Defs.' Ex. B, Part 1, at D00652, D001902); and (3) received a job offer from another company in 2011, after which he was given an $18,000 raise to retain him (App. 94-95; Defs.' Ex. B, Part 1, at D001895, D001903-04); and (4) had more favorable performance evaluations than Plaintiff, and was a higher producer, particularly with respect to new business development (App. 202-03, 475).

While Plaintiff maintains that this evidence is insufficient under the standard set forth in Stanziale because it does not establish that any of these factors were the actual reason for her lower salary, this argument is based on a misunderstanding of Defendants' burden in opposing her summary judgment motion.  See Stanziale, 200 F.3d at 108 ("[W]here . . . employers seek summary judgment as to [an] Equal Pay Act claim, they must produce sufficient evidence that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complaints.")  Had Defendants filed their own Motion, seeking judgment in their favor on Plaintiff's Equal Pay Act claim, as defendants did in Stanziale, it would be Defendants' burden to establish, with undisputed evidence, that the actual reason for the pay differential was a reason other than Plaintiff's gender.  Where Plaintiff has filed the Motion seeking judgment in her favor, however, the summary judgment standard requires only that

Defendants point to record evidence that creates a genuine issue of material fact as to whether factors other than sex explain the pay differential.   <u>See</u> Fed. R. Civ. P. 56 (a), (c)(1); <u>see also</u> <u>Galli</u>, 490 F.3d at 270 (stating that the evidence the non-moving presents must be "more than a scintilla," but "not as great as a preponderance" (citation omitted)).   In this case, Defendants have clearly done so.   Accordingly, we conclude that it is for a jury to weigh the evidence presented and determine whether the actual reason for the pay differential is Plaintiff's gender or some other reason, such as job performance or credentials.   We therefore deny Plaintiff's Motion for judgment in her favor on her Equal Pay Act claim in Count IX.

## IV.   CONCLUSION

For the foregoing reasons, we deny both Defendants' and Plaintiff's Motions for Partial Summary Judgment.   An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.